UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | Case No. 08 CR 388 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| CARLOS BELTRAN, | ) | |
| JESUS IVAN VAZQUEZ-RAMIREZ. | ) | |
| | ) | |

## MEMORANDUM OPINION & ORDER

Defendants Carlos Beltran and Jesus Ivan Vazquez-Ramirez move to suppress evidence uncovered on May 13, 2008 by the Drug Enforcement Administration (the "DEA") and challenge their arrests on that date arguing that the DEA violated their rights under the Fourth Amendment to the United States Constitution. Though Beltran and Vazquez-Ramirez challenge their arrests and the search of their respective Residences separately, the court resolves the motions together as they involve overlapping issues of fact and law.

## I. FINDINGS OF FACT

The government's version of the events leading up to the arrest of Beltran and Vazquez-Ramirez (altered for purposes of this opinion)[1] is as follows:

On May 13, 2008 at approximately 2:30 p.m. Drug Enforcement Administration Special Agent Donald Wood, and Task Force Officers ("TFO") James Healy, Michael Bedalow, Mark Porlier, Samuel Ayyad, John Kosmowski, and Edward Sobkowiak (collectively the "Officers") arrived at a two-flat, free-standing Residence located at 1901 South Harvey Avenue, Berwyn, Illinois (the "Residence") to conduct an interview.

---

[1] The court has additionally omitted those facts asserted by the government that lacked adequate support in the record.

Agent Wood and TFO Healy knocked on the front door of the Residence while the other Officers waited in front and on the side of the Residence.  No one answered the door.  About five minutes later TFO Ayyad saw someone in the second-story window.  TFO Ayyad identified himself to that individual as a police officer and asked him to come to the front door.  Before the individual arrived at the front door, some of the Officers pointed out to TFO Bedalow that the Residence had a security camera.  Vazquez-Ramirez opened the front door and stood on the front porch while speaking in Spanish on a cell phone.  Vazquez-Ramirez indicated to Agent Wood that his English was poor and that he was speaking to the owner of the Residence.  Vazquez-Ramirez handed the phone to Agent Wood, who began speaking to Carlos Beltran, the owner of the Residence.  Wood informed Beltran that he and other DEA Officers were at his home and wished to speak with him.  Beltran responded that he was at work and that it would take him at least an hour to arrive at the Residence.  Beltran additionally stated that he lived on the first floor of the two-flat Residence, denied that that there was any illegal contraband in the Residence and indicated that he would consent to a search of his home once he arrived onsite.  Agent Wood told Beltran that they would await his arrival at the Residence.

Beltran next agreed to speak to Vazquez-Ramirez to see if Vazquez-Ramirez would consent to a search of the second-floor apartment.  Wood handed the phone to Vazquez-Ramirez and after a short conversation in Spanish between the pair, Vazquez-Ramirez gave the phone back to agent Wood.  Beltran subsequently conveyed to Agent Wood that Vazquez-Ramirez would consent to search his Residence when Beltran arrived.  Agent Wood told the other Officers at the Residence what Beltran had said to him.

Agent Wood, TFO Healy, TFO Kosmowski, and Vazquez-Ramirez waited on the front porch for Beltran to arrive. Agent Wood asked Vazquez-Ramirez to provide him with the telephone numbers assigned to Vazquez-Ramirez's phones. Vazquez-Ramirez told Agent Wood the number for one of the phones, but could not remember the number for the second phone. Vazquez-Ramirez then passed both phones to Agent Wood who used them to call his own cell phone (confirming the numbers) and then returned them both to Vazquez-Ramirez.

Agent Wood asked Vazquez-Ramirez if anyone remained inside the Residence and Vazquez-Ramirez replied in the negative. According to Agent Wood, Vazquez-Ramirez appeared very nervous, was sweating, and spoke on his cell phone while the Officers and Vazquez-Ramirez waited for Beltran to arrive at the Residence. After waiting fifteen minutes, TFO Kosmowski, who was standing on the porch looking down the side of the house to the backyard, saw an individual he believed to be Beltran enter the backyard through the alley while talking on a cell phone; he informed the other Officers of the sighting. TFO Porlier and TFO Bedalow then moved toward the back of the Residence and observed that the back door to the Residence was closed, and no one was in the yard.

A short while after an individual entered the backyard of the Residence, Agent Wood and TFO Ayyad (while standing on the porch) heard footsteps coming from the second floor apartment and heard the door to the second-floor apartment slam shut. For the next twenty minutes or so, Agent Wood and other agents remained on the front porch with Vazquez-Ramirez. Meanwhile, TFO Bedalow noticed garbage cans positioned in the alley outside the fence bearing the number "1901" and searched them, uncovering

packaging materials which he believed were used to wrap kilogram-quantities of narcotics.

About twenty-five minutes after TFO Porlier moved to the back of the Residence, he saw Beltran exit the back door with his hand positioned inside his shirt and called out to Beltran several times. TFO Porlier approached Beltran, patted him down and discovered a large amount of U.S. currency in his front pocket. Beltran was sweating, shaking and very nervous after exiting the Residence, according to TFO Porlier. After being told that Beltran had come out the back door of the Residence, Agent Wood handcuffed Vazquez-Ramirez, and left him on the front porch with TFO Ayyad, while Agent Wood and TFO Healy went to the rear of the Residence to speak to Beltran. Agent Wood testified that when he reached the rear of the Residence, Beltran was sweating, "soaking wet," "extremely nervous," and "shaking," and that his appearance was consistent with someone who had been moving things around. Agent Wood asked Beltran what he was doing, and Beltran replied that he had just arrived at the Residence and was coming to talk to the agents. Agent Wood believed that Beltran was lying because an individual had been spotted entering the backyard approximately twenty minutes prior to Beltran's exit from the Residence and Agent Wood had heard someone rummaging around on the second floor. Agent Wood then asked Beltran where he parked his car. Beltran led Agent Wood to the alley and pointed out his car, which was parked several houses away from his own even though parking spots more proximate to the Residence were unoccupied. As Beltran and Agent Wood returned to the backyard, Agent Wood asked Beltran whether there was any contraband in his Residence; Beltran responded in the negative.

Agent Wood then asked Beltran whether he would consent to a search of his Residence. Beltran agreed, but told Agent Wood that, because Vazquez-Ramirez was renting the second floor, he did not have authority to authorize a search of that floor. Shortly thereafter, Beltran asked Agent Wood whether he had a search warrant. Agent Wood told him that he did not. Beltran then retracted his consent and told Agent Wood that he would prefer that Agent Wood obtain a search warrant. Agent Wood said that was fine.

Agent Wood then prepared to secure the premises in order to obtain a warrant. Agent Wood placed Beltran in handcuffs, and asked whether there was anyone else present inside of the Residence; Beltran responded that there was not. Agent Wood asked Beltran whether he could look inside the Residence to ensure there was no one inside; Beltran agreed. Agent Wood and other Officers then performed a protective sweep of Beltran's Residence and determined that there was no one inside the Residence. After performing the protective sweep, Agent Wood walked to the front porch with TFO Healy to talk to Vazquez-Ramirez. When Agent Wood arrived at the front porch, he contacted Agent Zamora, a Spanish-speaking agent, and asked him to interpret a conversation between Agent Wood and Vazquez-Ramirez. Phone records reflect that Agent Wood made a call to Agent Zamora during this period.

While speaking with Agent Zamora, Agent Wood informed Agent Zamora that he had recovered narcotics packaging from the garbage cans of the Residence and that he would like for Agent Zamora to ask Vazquez-Ramirez whether he would consent to the search of his Residence. Agent Wood then set his phone to speaker-mode and Agent Zamora and Vazquez-Ramirez had a brief conversation in Spanish. Agent Zamora began

by identifying himself, and then told Vazquez-Ramirez that agents had recovered kilogram packaging materials from the garbage cans. Agent Zamora also told Vazquez-Ramirez that the agents were seeking his consent to search his Residence. Vazquez-Ramirez responded in Spanish, "sure, go ahead." Agent Zamora asked Vazquez-Ramirez whether he would provide the agents with written consent, and Vazquez-Ramirez said that he would. Agent Zamora testified that Vazquez-Ramirez sounded calm during their conversation, and that he seemed to understand Zamora's questions and never responded in a way that indicated that he did not understand them. When Agent Zamora finished speaking with Vazquez-Ramirez, he told Agent Wood that Vazquez-Ramirez had just provided oral consent to search his Residence. Agent Wood then provided Vazquez-Ramirez with a consent form written in Spanish. Vazquez-Ramirez read the form and then he, Agent Wood, and TFO Healy signed it. TFO Healy wrote the time, "3:37 p.m." on the form immediately after everyone signed it. Agent Wood and TFO Healy watched as Vazquez-Ramirez put his initials next to the time. At that point, TFO Healy and Agent Wood conducted a quick search of the second floor apartment. During that search, TFO Healy and Agent Wood found two storage bins containing over $1 million in cash, a loaded pistol, and a significant amount of narcotics packaging material consistent both in color and texture with the packaging material that TFO Bedalow recovered from the garbage cans in the alley. After completing the search (which took ten or fifteen minutes) Agent Wood and TFO Healy then went to the backyard and Agent Wood informed Beltran that he had recovered a large amount of money from Vazquez-Ramirez's apartment and packaging material in the garbage cans, that Beltran was being detained, and that the agents were going to obtain a search warrant. As Agent Wood was walking

Beltran to his vehicle, Beltran advised him that he wanted to cooperate, and consented to a search of his Residence. An agent then gave Beltran a written consent form, which Beltran read and signed. TFO Healy noted the time the consent form was signed ("3:50 p.m.") on the form. Beltran acknowledged that the basement was part of his Residence and he had access to it. However, he claimed that he rented one small room in the basement to another individual.

The Officers then searched Beltran's Residence and recovered, *inter alia*, a shotgun, scales, packaging material, and a heat sealer. The packaging material recovered from Beltran's Residence was consistent in both color and texture with packaging material recovered from the upstairs apartment and from the garbage can in the alley behind the Residence. After searching Beltran's Residence, agents searched a washer and dryer located in a common area on the second floor, just outside of the second floor apartment, and recovered approximately three kilograms of cocaine and a large sum of U.S. currency. While the search of Beltran's Residence was occurring, Beltran sat in the front room of his Residence, along with TFO Porlier. During that time, Beltran engaged in small talk with TFO Porlier and was social and cooperative. At approximately 4:30 p.m., Beltran was read his Miranda rights and was asked by Agent Wood if he would like to cooperate and consent to an interview. Beltran declined, saying that he viewed his consent to search as cooperation. Thereafter, Vazquez-Ramirez and Beltran were brought to separate police stations for processing.

### A. Factual Disputes

Beltran and Vazquez-Ramirez present a version of the events of May 13, 2008 that differs substantially from the government's. For example, where the government

contends Vazquez-Ramirez signed a consent to search form prior to conducting its search of the Residence and after Agent Zamora spoke to Vazquez-Ramirez in Spanish about consenting to that search, Vazquez-Ramirez claims that the conversation with Agent Zamora on the telephone never occurred and that he signed the Spanish language consent to search form only after he was brought to a police station. Beltran, for his part, admits to signing a consent to search form, but contends that his consent was nevertheless involuntary.

While both Beltran and Vazquez-Ramirez presented testimony that established a sequence of events that diverged materially from the government's, neither defendant has pointed to any inconsistencies in the testimony of the seven government witnesses who testified over the course of four days of in-court hearings, and the court has not located any discrepancies on its own. Absent evidence that the government's account is unreliable, Beltran and Vazquez-Ramirez effectively ask the court to suppress evidence and quash their arrests[2] based solely on crediting their testimony in preference to the consistent testimony of government agents. The government, however, has articulated a number of reasons why Beltran's and Vazquez-Ramirez's testimony should not be credited.

With respect to Vazquez-Ramirez, the government points to various testimonial inconsistencies (*see* Government's Post Hearing Submission 12-14) which, when considered cumulatively, undermine Vazquez-Ramirez's credibility. For example, Vazquez-Ramirez presented a shifting account of which room he occupied on the second

---

[2] The precise relief sought in Beltran's and Vazquez-Ramirez's respective motions (*see* Doc. Nos. 34 & 51) is ambiguous, but the court will construe both defendants' motions as seeking both suppression of all the evidence uncovered in the Officers' search for which each has standing, and to quash the their respective arrests.

floor of the Residence. In his affidavit Vazquez-Ramirez claimed that a man named Luis lived in the bedroom where the government recovered drugs and money. At the hearing, however, Vazquez-Ramirez said that Luis actually slept in a room where the government found a loaded pistol. Even so, Vazquez-Ramirez admitted that some of his clothes were stored in the room with the pistol, and that he slept in that room on occasion when Luis was out. More damagingly, Vazquez-Ramirez maintained that he was living in Arizona up until two weeks prior to his arrest in Chicago, even though phone records indicated that he activated one of his phones on December 12, 2007 (five months before his arrest) and registered it to an address in Chicago.

In addition to discrediting Vazquez-Ramirez's credibility, the government also provides phone records reflecting calls between Agent Wood and Agent Zamora to back up its claim (denied by Vazquez-Ramirez) that Agent Zamora spoke to Vazquez-Ramirez in Spanish about obtaining Vazquez-Ramirez's consent to search immediately before Vazquez-Ramirez read and signed the Spanish language consent to search form. Accordingly, the court credits the government's version of events with respect to Vazquez-Ramirez as set out *supra*. The combination of testimonial discrepancies and the court's assessment of Vazquez-Ramirez's credibility on the witness stand, taken in conjunction with the consistent testimony of the agents, lead the court to discredit his version of the events.

As for Beltran, the government highlights a number of testimonial discrepancies to argue that his version of the events of May 13, 2008 is also unreliable in all material respects. Most damaging to his general credibility, Beltran denied that he was arrested for soliciting prostitution, even after admitting to arrests for three other crimes and being

shown an arrest record reflecting the solicitation charge and bearing a photograph of Beltran. A series of other implausible statements further discredit Beltran: he maintained that he parked his car in a back alley a significant distance from the Residence (even though a more convenient space was available) because of "street cleaning" and then admitted that the alley is never cleaned; he claimed to have spoken with Vazquez-Ramirez twice on May 13, 2008, when phone records reflect nine calls between the two men's telephones; he attempted to explain away the fact that he was soaked with sweat when TFO Porlier saw him exit the back door of the Residence by claiming he had sprayed himself with a hose near the backdoor (never having entered the Residence) because it was "very hot" that day, but then admitted on cross-examination that the temperature was only seventy-three degrees Fahrenheit; he claimed that it took him between thirty to forty-five minutes to drive the eight miles to his Residence after he agreed to meet the agents there; and, finally, after a drug-sniffing dog found wet baggies in a garbage can in Beltran's laundry room he proposed that the garbage can was usually kept in a back bedroom where another tenant sleeps, while simultaneously admitting that the room had no bed in it at the time of the search and was filled with office supplies.

The court finds Beltran's testimony incredible and adopts the government's version of events as set out above.

## II. LEGAL ANALYSIS

### A. Vazquez-Ramirez

Vazquez-Ramirez moves the court to quash his arrest contending that it was not supported by reasonable suspicion and therefore violated his Fourth Amendment rights. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968).[3]

The Fourth Amendment permits a law enforcement officer to subject a person to an investigative stop if the officer reasonably suspects that the person was committing or is about to commit a crime. *See id.* To lawfully conduct a *Terry* stop an officer must be "aware of specific and articulable facts giving rise to reasonable suspicion." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994). The Seventh Circuit recently opined that:

> Reasonable suspicion is more than a hunch but less than probable cause and considerably less than preponderance of the evidence. It requires some minimal level of objective justification for making a stop, given the totality of the circumstances. Moreover, a court's determination of reasonable suspicion must be based on common-sensical judgments and inferences about human behavior. Because reasonable suspicion is evaluated in light of the totality of the circumstances known to the officer, we have noted that certain behavior may give rise to reasonable suspicion when viewed in the context of other factors at play.

*Jewett v. Anders*, 521 F.3d 818, 823-24 (7th Cir. 2008) (internal citations and quotation omitted). The court additionally examines whether the *Terry* stop was justified at its

---

[3] Vazquez-Ramirez contends that his detention was an investigative stop under *Terry v. Ohio*, 392 U.S. 1 (1968) and asks the court to suppress the evidence uncovered after his *Terry* detention based on the unlawfulness of that investigative stop. Though Vazquez-Ramirez's motion is styled as a motion to quash his arrest, Vazquez-Ramirez has not provided an argument for why his ultimate arrest was unlawful and therefore should be quashed.

inception and whether the scope of the stop was reasonably related to the circumstances necessitating it. *Id*.

As the court found Vazquez-Ramirez's testimony incredible, it undertakes the *Terry* analysis based on the government's version of the facts. Vazquez-Ramirez was thus detained at approximately 3:25 p.m. when Agent Wood handcuffed Vazquez-Ramirez after Beltran was spotted exiting the rear of the Residence. The government argues that Agent Wood had reasonable suspicion to detain Vazquez-Ramirez because Agent Wood was aware (1) of kilogram narcotics packaging disposed of in a trash can outside the Residence that bore the house number of the Residence; (2) that Vazquez-Ramirez was sweating and nervous while he waited on the front porch with the Officers for Beltran's arrival; (3) that there was a security camera at the entrance to the house facing the street; and (4) Vazquez-Ramirez was in phone contact with Beltran when he came to the front door of the Residence at the Officer's request. Further, the government contends that this knowledge, combined with Beltran's actions (lying about the time it would take him to arrive at the Residence and exiting the back door of the house) gave Wood reasonable suspicion to believe that Vazquez-Ramirez and Beltran "were engaged together in narcotics-related activities." Mem. 17. Moreover, the government asserts that it was reasonable for Agent Wood to handcuff Vazquez-Ramirez because after Agent Wood left to assist the other Officers with Beltran at the back of the Residence, only one officer was left with Vazquez-Ramirez and Beltran was a known police threat. The government further adds that the Officers had not yet conducted a protective sweep of the Residence and therefore Wood did not know whether there were weapons inside the Residence to which Vazquez-Ramirez could gain access.

As an initial matter, the record reveals no evidence that Agent Wood knew about the security camera at the Residence when he handcuffed Vazquez-Ramirez. The government cites only the testimony of TFO Bedalow for the proposition that "agents noticed a security camera installed on the side of the Residence." Mem. 2. While the record supports the government's characterization of Bedalow's testimony, that testimony does not show that Wood was aware of the security camera when he handcuffed Vazquez-Ramirez. Absent this evidentiary support, the court will not consider the presence of the security camera at the Residence in the reasonable suspicion analysis. The court likewise declines to find that Agent Wood knew that Beltran was a police threat. The record reveals only that TFO Healy had reviewed Beltran's criminal history report and was aware that the report noted that Beltran was a police threat. *See* Jan. 6, 2009, 256-57. The government has pointed to no evidence that Agent Wood knew of Beltran's criminal status.

The question for the court, then, is whether Agent Wood's knowledge that narcotics packaging was discovered in a trash bin outside the Residence, and his observation of Vazquez-Ramirez's apparent familiarity with Beltran and nervous demeanor as he and the Officers waited for Beltran to arrive (when considered together with Beltran's sudden exit from the back of the Residence) amounted to reasonable suspicion that Vazquez-Ramirez had been involved, or was about to engage, in criminal activity.

As the court set out above, the reasonable suspicion standard requires Agent Wood to have had "more than a hunch" that Vazquez-Ramirez was involved in criminal activity, but less than probable cause and substantially less than a belief that Vazquez-

Ramirez's engagement in criminal activity was more probable than not. *Jewett*, 521 F.3d at 823-24. Vazquez-Ramirez's nervous demeanor and the discovery of kilogram-quantity narcotics packaging outside the Residence is sufficient to meet the reasonable suspicion standard when combined with Beltran's sudden exit from the back door of the Residence and the "permissible deduction" (*see United States v. Carillo*, 269 F.3d 761, 767 (7th Cir. 2001)) that Vazquez-Ramirez might have been speaking in Spanish to Beltran on the phone while the Officers awaited Beltran's arrival and Beltran was presumably rummaging around the Residence.[4]

Officer Wood's restraint of Vazquez-Ramirez with handcuffs was also lawful under the circumstances. *See Jewett*, 521 F.3d at 823-24. Handcuffing a detainee does not automatically convert a *Terry* stop into an arrest requiring probable cause. *See United States v. Askew*, 403 F.3d 496, 506 (7th Cir. 2005). Moreover, the Seventh Circuit has noted that "guns are known tools of the [drug] trade" and that investigations and arrests of drug traffickers are therefore inherently dangerous operations. *See United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005). Given Agent Wood's reasonable suspicion that Vazquez-Ramirez was involved in the narcotics trade, restraining Vazquez-Ramirez for a few minutes while Agent Wood investigated Beltran's exit form the Residence was lawful.

### B. Vazquez-Ramirez's Pat-Down and Consent to Search

Between approximately 2:40 and 3:25 (before Vazquez-Ramirez was handcuffed) the agents and Officers testified that Vazquez-Ramirez remained on the front porch with them while they awaited Beltran's arrival at the Residence, though the Officers never told

_____

[4] Agent Wood testified that before Beltran exited the house they heard someone making loud noises on the second floor for approximately twenty minutes.

14

him that he was required to remain on the porch. Sometime during that period, however, one of the Officers conducted a pat-down of Vazquez-Ramirez. While Vazquez-Ramirez has not separately challenged the pat-down[5] (and the government has not articulated why it was conducted)[6], a protective pat-down is a *Terry* search and is therefore "appropriate only if the agents have at a minimum some articulable suspicion that the subject is concealing a weapon or poses a danger to the agents or others." *United States v. Kenerson*, 585 F.3d 389 (7th Cir. 2009) (quoting *United States v. Pedroza*, 269 F.3d 821, 827 (7th Cir. 2001)). The record reflects that at the time an officer conducted a pat-down of Vazquez-Ramirez some Officers knew that there was a security camera on the premises and that Agent Wood and TFO Healy noticed that Vazquez-Ramirez was sweating and nervous. However, the record does not establish which officer or agent frisked Vazquez-Ramirez. Without knowing who conducted the pat-down and why, the court cannot determine whether it was based on reasonable suspicion. This failure of proof creates a problem for the government, however, because the lawfulness of the pat-down determines the standard by which the court evaluates the voluntariness of Vazquez-Ramirez's consent to search.

Were the pat-down found unlawful it would vitiate Vazquez-Ramirez's subsequent consent to search his apartment in the Residence unless the government shows that his consent "resulted from an independent act of free will." *Id*. The Seventh Circuit instructs that consent is an independent act of free will where the "primary

---

[5] Vazquez-Ramirez claims that he was frisked, handcuffed and immediately detained in an unmarked vehicle for an hour after Agent Wood finished speaking with Beltran on the telephone, and challenges his arrest based on that version of events (which the court rejected as unreliable). *See* Mem. 6.

[6] The government mentions the pat-down in its memorandum, contending that it was conducted for officer safety and citing to the testimony of Agent Wood as support (*see* Jan. 5, 2009 Trans. 25). But Agent Wood stated only that the pat-down occurred. There is no record of who conducted the pat-down or why it occurred.

15

illegality" or "taint" (here, the potentially unlawful frisk) was not exploited to obtain subsequent consent to search. *Id.* (*citing United States v. Green*, 111 F.3d 515, 520 (7th Cir. 1997)). To determine whether the consent to search was "purged of the primary taint" the court considers: "(1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *United States v. Green*, 111 F.3d 515, 520 (7th Cir.1997) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

Here, the pat-down involved a search of the outer layer of Vazquez-Ramirez's clothing, was minimally invasive and was presumably carried out to ensure officer safety;[7] there is no flagrancy in such conduct. There were also "intervening circumstances." After the pat-down, Vazquez-Ramirez continued to speak freely on his cell phone and indeed spoke to Beltran on nine separate occasions between 2:41 p.m. and 3:22 p.m., a period between the Officers' arrival at the Residence and the arrest of Beltran after he exited the back door of the Residence. Moreover, Vazquez-Ramirez was handcuffed in a subsequent lawful Terry stop discussed at length above at around 3:25 p.m.. Finally, while it is unclear from the record precisely when the pat-down occurred, some time elapsed between when Vazquez-Ramirez was patted-down and when Vazquez-Ramirez signed the consent to search form at 3:37 p.m.. Assuming, then, that the pat-down of Vazquez Ramirez was unlawful, the court nevertheless finds that the

---

[7] The government cites to the court's transcript of the suppression hearing held on January 5, 2009 (p.25) for the proposition that the pat-down was conducted to ensure officer safety, but as elaborated in note 7, *supra*, the record does not support that statement. Nonetheless, Fourth Amendment analysis of reasonable suspicion is governed by "common-sensical judgments and inferences about human behavior" and inferring that a pat-down was conducted to ensure officer safety is consistent with the requisite realist view.

violation was sufficiently attenuated from Vazquez-Ramirez's grant of consent to search that the taint of the pat-down has no legal effect on that status of that consent.

This finding does not end the inquiry, however. The government still bears the burden of proving by a preponderance of the evidence that Vazquez-Ramirez's consent to search was freely and voluntarily given. *See United States v. Sandoval-Vazquez*, 435 F.3d 739, 744 (7th Cir. 2006). Whether consent is voluntary is a question of fact resolved by consideration of the totality of the circumstances (*id.*), but the court must embark on this analysis by weighing the following factors: Vazquez-Ramirez's (1) age, intelligence, and education; (2) whether he was advised of his constitutional rights; (3) how long he was detained before he gave his consent; (4) whether his consent was immediate, or was prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6) whether the individual was in police custody when he gave his consent. *United States v. Figueroa-Espana*, 511 F.3d 696, 704 -705 ( 7th Cir. 2007). The court assesses these factors in turn.

Vazquez-Ramirez is literate in Spanish and attended some school in Mexico, though the record does not specify the extent of his education; his English is poor. The consent form Vazquez-Ramirez signed is written in Spanish, and states that Vazquez-Ramirez was not forced to sign the form and consented to the search of his Residence voluntarily. The form did not, however, "clearly spell[] out defendant's rights," as the government contends. Most saliently, the form makes no mention of a defendant's right to refuse the search. Even so, ample (and credible) record evidence suggests that Vazquez-Ramirez understood that his consent was voluntary. The form itself specifies both that the signatory acknowledges that he has not been forced or threatened in any

way to sign the form and that he has voluntarily consented to the search.  *See* Gov. Ex. Vazquez Ramirez Consent Form.  Additionally, Spanish-speaking Agent Zamora spoke to Vazquez-Ramirez on the phone and asked for his consent to search his apartment; Vazquez-Ramirez consented orally to Agent Zamora in Spanish and Vazquez-Ramirez subsequently signed the Spanish-language form in the presence of Agent Wood and TFO Healy.  Furthermore, when Agent Wood first arrived at the Residence and spoke with Beltran on Vazquez-Ramirez's telephone, Agent Wood asked Beltran over the phone if Beltran would ask Vazquez-Ramirez in Spanish if Vazquez-Ramirez would consent to search his apartment.  Then Beltran, after having a conversation with Vazquez-Ramirez over the phone, told Agent Wood (again, over the phone) that Vazquez-Ramirez had agreed to consent, but that Vazquez-Ramirez wished for the Officers to wait for Beltran's arrival at the Residence before conducting the search.  This last point is the most significant to the question of voluntariness, in the court's view, because Vazquez-Ramirez restrained the Officers' actions at the beginning of his encounter with them. That restraint was respected as the Officers waited nearly an hour to search his premises and did so only after Vazquez-Ramirez granted written consent.

Rounding out the court's consideration of the relevant voluntariness factors (*see* p. 17 above): Vazquez-Ramirez was handcuffed for only a few minutes prior to giving written consent; Beltran indicated to Agent Wood that Vazquez-Ramirez immediately consented to a search of his abode (contingent on Beltran's arrival at the residence) when Beltran spoke to Vazquez-Ramirez over the phone at Agent Wood's request.  Agent Wood renewed his request for Vazquez-Ramirez's consent to search after Beltran's exit from the rear of the Residence, when Vazquez-Ramirez spoke to Spanish-speaking Agent

Zamora on the phone and signed the Spanish-language consent to search form. There is no evidence that physical coercion was used to obtain consent, and the form that Vazquez-Ramirez signed stated that the Officers had not used physical coercion to secure his signature on the consent form. Vazquez-Ramirez was handcuffed in a lawful *Terry* stop immediately prior to his grant of consent to the search of his Residence, but was *not* handcuffed when he spoke to Agent Zamora and gave oral consent and subsequently signed the consent to search form.

None of the six factors addressed above definitively determine the voluntariness of Vazquez-Ramirez's consent; rather the factors frame the court's assessment of the circumstances surrounding Vazquez-Ramirez's grant of consent. *See United States v. Hicks*, 539 F.3d 566, 570 (7th Cir. 2008). In this light, the court finds that Vazquez-Ramirez's consent to the search of his apartment was voluntary and that the arrest that resulted from the incriminating evidence found in his apartment was supported by probable cause and accordingly lawful. The court is particularly persuaded that Vazquez-Ramirez's consent was voluntary because, for approximately forty minutes, Vazquez-Ramirez watched while he intermittently spoke on the telephone, as the Officers obeyed his and Beltran's request to wait to search the premises until Beltran was present at the Residence. The Fourth Amendment commands that the court make common-sense judgments about human behavior. *Jewett*, 521 F.3d at 824. While the presence of a half-dozen or so law enforcement Officers at one's home is surely distressing, the cumulative message conveyed by the Officers' willingness to wait for Beltran to arrive before asking Vazquez-Ramirez to sign a consent to search form, having Vazquez-Ramirez discuss signing the form with a Spanish-speaking agent and, indeed, having Vazquez-Ramirez

sign the form, is that Vazquez-Ramirez had some agency in the situation, and particularly the power to refuse consent to search. Under the totality of the circumstances, Vazquez-Ramirez's consent was voluntary.

### C. Beltran's Motion to Suppress

As an initial matter, Beltran contends without any factual support that his arrest after his exit from the rear of the Residence was unlawful and that the taint of that unlawful seizure vitiated his consent to search the Residence. The government argues that TFO Porlier had probable cause or, alternatively, reasonable suspicion to seize Beltran upon his exit from his home because agents had (1) noticed a security camera on the outside of the Residence; (2) spotted Beltran exiting the rear of his home; (3) heard Beltran rummaging around the second floor apartment (where Vazquez-Ramirez resides) for twenty minutes while the Officers awaited his arrival; and (4) found kilogram narcotics packaging materials in the garbage of the Residence.

The court must in part disregard two of these bases for probable cause. TFO Porlier initiated the seizure of Beltran after his exit form the rear of the Residence, but the record does not reflect that TFO Porlier was aware of the security camera on the outside of the Residence, and, as discussed above, neither does the record reflect that Agent Wood was aware of the security camera. The record also fails to establish that TFO Porlier heard someone inside the Residence prior to Beltran's exit from the rear of the Residence, though Agent Wood testified that *he* heard someone inside the Residence.

These testimonial gaps leave the court to consider whether the kilogram packaging materials found in a garbage can and the fact that Beltran exited his apartment are enough to establish that TFO Porlier had probable cause or reasonable suspicion to

seize Beltran. TFO Porlier plainly had reasonable suspicion after Beltran's exit. All of the Officers were aware that they were awaiting Beltran's arrival at the Residence so that they could conduct a search. Beltran initially indicated that it would take him between forty-five minutes and an hour to meet the Agents at the Residence. Beltran's exit from the rear of the residence when Beltran knew that the Officers awaited his arrival was suspicious. That suspicion, when combined with the knowledge that narcotics packing was discovered outside the Residence, and further combined with the knowledge that the drug trade frequently involves gun violence (*see Askew*, 403 F.3d at 507) (and therefore Beltran could have had a gun) renders TFO Porlier's stop of Beltran immediately after his exit and subsequent pat-down legal under *Terry*.

Agent Wood's handcuffing of Beltran a few minutes later was also supported by reasonable suspicion, as Agent Wood was aware of the information that TFO Porlier was aware of and, additionally, had heard someone moving around inside the second-floor of the Residence prior to Beltran's exit. Then, after the Officers conducted a search of the second floor of the Residence (with Vazquez-Ramirez's legal consent) and recovered $1 million dollars in cash, a loaded pistol and narcotics packaging material consistent with the material found in the garbage outside the Residence, Agent Wood's reasonable suspicion ripened into probable cause.

As Beltran's detention and arrest was lawful, the government bears the burden of proving by a preponderance of the evidence that Beltran's consent to the search of the Residence was freely and voluntarily given; whether consent is voluntary is a question of fact resolved by consideration of the totality of the circumstances, but framed by six factors. *See Sandoval-Vazquez,* 435 F.3d at 744;. *Figueroa-Espana*, 511 F.3d at 704-05.

At the suppression hearing Beltran admitted that he understood (1) what a search warrant was, (2) that law enforcement Officers must have a search warrant in order to enter a home without consent, and (3) that he had the right to deny the Officers consent to search his home. *See* April 3, 2009 Tr. 706-07. Beltran also admitted to signing the consent to search form which was entered into evidence at the suppression hearing. *Id.* All of these admissions strongly suggest that Beltran consented to the search of his Residence voluntarily. Even so, the court conducts the mandatory six-factor analysis below.

Beltran admits that he is intelligent enough to consent, but cites *United States v. Talkington*, 843 F.2d 1041, 1048 (7th Cir. 1988) for the proposition that his intelligence "is insufficient to support a finding that his confession [sic] was voluntary." Mem. 4. Beltran is correct on this point of law, but the government does not rely on Beltran's intelligence alone to support the voluntariness of Beltran's consent. Furthermore, *Talkington* actually supports the government's position that Beltran was not coerced into signing a consent to search form here.

*Talkington* remanded the appellant's suppression motion to the district court because the district court failed to make any finding with respect to voluntariness, even though the district court had noted that the appellant-movant was "terrorized" by agents who "burst into the Talkington home, at night, with weapons drawn." *Talkington*, 843 F.2d at 1048. Nothing approaching that kind of coercion was present in this case. To the contrary, as with Vazquez-Ramirez, the Officer's consistent adherence to Beltran's requests conveyed to Beltran that he had a significant degree of control over the Officers' actions. At the outset, Agent Wood and the other Officers followed Beltran's direction to

wait until he arrived at the premises to conduct the search to which he had orally consented. Moreover, when Beltran withdrew his consent after he exited the rear of the Residence, the Officers respected his retraction and began securing the premises in order to obtain a search warrant. Finally, it was Beltran who offered (without prompting from any of the Officers) to consent to search after the Agents told him – truthfully – that the Officers had recovered a large amount of money from Vazquez-Ramirez's second-floor apartment after he consented to the search.

Even so, Beltran insists that his consent was involuntary because "there was ever-present coercion by the police," which he bases on the Officers' refusal to leave upon his request, and the fact that the Officers "parked themselves on the defendant's doorstep and surrounded the Residence with surveillance officers." Mem. 5. Agent Wood testified that in his initial phone conversation with Beltran, Beltran had asked the Officers to leave and return later to the house to conduct a search. Agent Wood and the Officers did not leave, instead waiting until Beltran returned to the Residence to conduct the search that Beltran over the phone had consented to contingent on his arrival. Beltran cites to no pertinent authority for this position, but attempts to bolster his coercion argument with citations to *Florida v. Bostick*, 501 U.S. 429 (1991), and *United States v. Jerez*, 108 F.3d 684 (7th Cir. 1997); both are inapposite.

*Bostick* is relevant only to the preliminary question of whether an encounter with law enforcement implicates the Fourth Amendment at all. *See Bostick*, 501 U.S. at 434-35 (police questioning of individuals is permissible and does not constitute a Fourth Amendment seizure requiring either reasonable suspicion or probable cause provided "the police do not convey a message that compliance with their requests is required").

Here the court has already determined that Beltran's encounter with the police triggered Fourth Amendment scrutiny and that the officers lawfully detained Beltran based on reasonable suspicion (and later arrested him based on probable cause) in compliance with the Fourth Amendment. *See supra* pp. 20-21. Beltran's citation – which describes a standard governing when a police encounter triggers the Fourth Amendment's protections – is thus irrelevant to the voluntariness analysis here, because the court has already found that the Fourth Amendment was implicated in Beltran's encounter with the police.

*Jerez* found that two individuals were illegally seized under *Terry* when the police knocked on the door of their hotel room without reasonable suspicion in the middle of the night, and that the unlawful *Terry* seizure vitiated the *Jerez* defendants' consent to search. But *Jerez*'s consent analysis is inapplicable here because, as described on page 21 above, Beltran's *Terry* seizure was lawful and the court applies a different standard to assess the voluntariness of consent to search where the requirements of the Fourth Amendment were complied with.

Beltran additionally urges the court to find that his consent was involuntary because he was in handcuffs when he consented, and because the Officers repeatedly requested his consent. Mem. 5. Beltran's restraint and detention at the time of consent does not mechanically vitiate his consent to search. Consent to search can be voluntary where it was given "while a defendant was in custody without having received Miranda warnings." *United States v. Renken*, 474 F.3d 984, 987-88 (7th Cir. 2007). Here, Beltran had not been given his *Miranda* warnings prior to consenting to search, but Beltran admitted that he understood that he could refuse consent to search; again, the Officers' acquiescence in Beltran's request that they wait to search the Residence showed Beltran

that he had some control over the situation. Moreover after being given his *Miranda* warnings, Agent Wood asked Beltran if he wished to consent to an interview and Beltran declined, showing, again, that Beltran understood that he could refuse the Officers' requests.

As for whether Beltran's consent was immediate or prompted by repeated requests by the authorities, Beltran was asked for consent (1) when Agent Wood spoke to him on the phone a few minutes after the Officers arrived at the Residence, and (2) after Beltran exited the back door of the Residence. On the first occasion Beltran's consent was immediate: he told Agent Wood that he consented to the search of his apartment, but asked that the Officers wait to conduct the search until he arrived at the Residence. Beltran's contention that he was repeatedly asked for consent is based on testimony that the court has already discredited. Moreover, on cross-examination Beltran himself admitted that he consented immediately to the search over the phone. *See* Apr. 3, 2009 Tr. 704.

Rounding out the court's review of the six voluntariness factors, Beltran was detained for approximately twenty minutes before he signed a consent to search form, though he granted oral consent prior to his detention.

Finally, Beltran argues that the court should consider Agent Wood's "threat to get a search warrant" in the totality of the circumstances. *See* Mem. 5. Agent Wood did not "threaten" to get a warrant, but rather, when asked by Beltran whether he had a warrant, Wood stated that he did not. Beltran then retracted his consent, and told Agent Wood that Beltran would prefer it if Agent Wood procured a search warrant. Agent Wood then began securing the premises in order to obtain a search warrant by, *inter alia*, performing

a protective sweep inside the premises (again, with Beltran's permission) to make sure that no one was inside the Residence. A law enforcement officer's statement that he will obtain a warrant is lawful if the officer has a reasonable factual basis to believe that there is probable cause to obtain a warrant. *See Hicks*, 539 F.3d at 571. Agent Wood had a reasonable factual basis to believe that there was probable cause to get a search warrant based on the kilogram narcotics packaging material found in the garbage outside the Residence and Beltran's behavior inside the Residence prior to his exit from the back door of the Residence. Moreover, even if Wood did not have a reasonable basis to believe he had probable cause to procure a search warrant, his statement came in response to Beltran's request for Agent Wood to obtain a search warrant and so cannot be viewed as "merely a pretext to induce submission" to a search. *Id.*

Having considered the six factors above, along with the totality of the circumstances, the court concludes that Beltran voluntarily granted consent to search.

### CONCLUSION

Beltran's Motion to Suppress Evidence Pursuant to Federal Rule of Criminal Procedure 12 and Vazquez-Ramirez's Motion to Quash Arrest and Suppress Evidence are denied.


ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: January 28, 2010